REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
Tel.: 212.521.5400
Fax: 212.521.5450
   Eric A. Schaffer
   Mark D. Silverschotz
   Gail M. Eckstein
   *Attorneys for The Bank of New York Mellon*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>NATIONAL SPORTS ATTRACTION, LLC, et al.,<br><br>          Debtors. | Chapter 7<br><br>Case No. 09-11162 (RDD) |
| STRUCTURE-TONE, INC., et al.,<br><br>          Plaintiffs,<br><br>vs.<br><br>PHILIP SCHWAB, et al.<br><br>          Defendants. | Adversary Proceeding No. 09-01438 |

---

**MEMORANDUM OF LAW OF BANK OF NEW YORK MELLON IN SUPPORT OF**
**MOTION FOR DISMISSAL OF COMPLAINT AND OTHER RELIEF**

---

Dated: October 23, 2009

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND.....................................................................................................2

I.     The Basic Documents ............................................................................................2

II.    Interactions Among the Parties.............................................................................5

III.   Bondholders' February 2009 Instruction to BNY Mellon Directing Disbursement of Funds .................................................................................................................7

IV.   Present Action .......................................................................................................9

ARGUMENT ...............................................................................................................................9

I.     LEGAL STANDARD ON MOTION TO DISMISS............................................9

II.    BNY MELLON IS NOT LIABLE AS A STATUTORY TRUSTEE UNDER NEW YORK LIEN LAW ARTICLE 3-A.........................................................11

III.   CLAIMS UNDER ARTICLE 3-A AGAINST A PARTY THAT IS NOT A STATUTORY TRUSTEE MUST BE DISMISSED .........................................13

IV.   BOND PROCEEDS HELD BY THE INDENTURE TRUSTEE NEVER BECAME TRUST ASSETS UNDER ARTICLE 3-A ....................................15

CONCLUSION..........................................................................................................................22

# TABLE OF AUTHORITIES

**Cases**

*ALB Contracting Co. v. York-Jersey Mortgage Co.*
  60 A.D.2d 989, 989, 401 N.Y.S.2d 934 (4th Dep't 1978)..................................... 11, 12, 13, 16

*Ashcroft v. Iqbal*
  129 S.Ct. 1937 (2009)..................................................................................... 10

*Avon Elec. Supplies, Inc. v. Christ Gatzonis Elec. Contractors, Inc.*
  235 A.D.2d 380, 380, 652 N.Y.S. 2d 72 (2d Dep't 1997)...................................... 18

*Bell Atl. Corp. v. Twombly*
  127 S. Ct. 1955 (2007)................................................................................. 9, 10

*Bos-Hatten, Inc. v. Holtec Int'l Corp.*
  186 A.D.2d 1031, 1031, 588 N.Y.S.2d 479 (4th Dep't 1992)........................... 13, 18

*Caledonia Lumber & Coal Co. v. Chili Heights Apts.*
  70 A.D.2d 766, 766, 417 N.Y.S.2d 536 (4th Dep't 1979)................................ 13, 16

*Cortec Indus., Inc. v. Sum Holding, L.P.*
  949 F.2d 42 (2d Cir. 1991) .............................................................................. 10

*Elliott Assocs. V. J. Henry Schroder Bank & Trust Co.*
  838 F.2d 66 (2d Cir. 1988) .............................................................................. 14

*Festa v. Local 3 Int'l Bhd. of Elec. Workers*
  905 F.2d 35 (2d Cir. 1990) .............................................................................. 10

*Givoh Assocs. & KZHB v. American Druggists Ins. Co.*
  562 F.Supp. 1346 (E.D.N.Y. 1983) ............................................................ 11, 12, 13

*Global Network Commc'ns, Inc. v. City of N.Y.*
  458 F.3d 150 (2d Cir. 2006) ............................................................................ 10

*Grosso v. Truax & Hovey, Ltd.*
  9 B.R. 815 (Bankr. N.D.N.Y. 1981) ........................................................... 15, 16, 18

*In re AlphaStar Ins. Group Ltd.*
  383 B.R. 231 (Bankr. S.D.N.Y. 2008)............................................................... 10

*In re Elevator Antitrust Litig.*
  502 F.3d 47 (2d Cir. 2007) ................................................................................ 9

*In re Elm Ridge Assocs.*
  234 F.3d 114 (2d Cir. 2000) ....................................................................... 11, 13

*In re Enron Corp.*
  328 B.R. 58 (Bankr. S.D.N.Y. 2005) ........................................................................ 10

*In re Fabrikant & Sons, Inc.*
  394 B.R. 721 (Bankr. S.D.N.Y. 2008) ..................................................................... 9, 11

*In re Leslie Fay Companies, Inc.*
  166 B.R. 802 (Bankr. S.D.N.Y. 1994) ...................................................................... 10

*In re Magnesium Corp. of America*
  399 B.R. 722 (Bankr. S.D.N.Y. 2009) ...................................................................... 10

*In re Musicland Holding. Corp.*
  398 B.R. 761 (Bankr. S.D.N.Y. 2008) ...................................................................... 10

*In re Park South Securities, LLC.*
  326 B.R. 505 (Bankr. S.D.N.Y. 2005) ...................................................................... 10

*Interel Environmental Technologies, Inc., v. United Jersey Bank*
  894 F.Supp.623 (E.D.N.Y. 1995) ....................................................................... passim

*Iqbal v. Hasty*
  490 F.3d 143 (2d Cir. 2007) ..................................................................................... 10

*Labjo v. Best Buy Stores, L.P.*
  478 F. Supp. 2d 523 (S.D.N.Y. 2007) .................................................................. 10, 11

*Leeds v. Meltz*
  85 F.3d 51 (2d Cir. 1996) ........................................................................................... 9

*Meckel v. Continental Resources Co.*
  758 F.2d 811 (2d Cir. 1985) ..................................................................................... 14

*Palmer Construction Inc. v. Hines*
  154 Misc.2d 248, 251, 584 N.Y.S.2d 271 (N.Y. Sup. Ct. 1992) ............................. 15

*Paycom Billing Servs. v. Mastercard Int'l, Inc.*
  467 F.3d 283 (2d Cir. 2006) ..................................................................................... 10

*Seaboard Surety Co. v. Mass. Bonding and Ins. Co.*
  17 A.D.2d 795, 795, 232 N.Y.S.2d 809 (1st Dep't 1962) ........................................ 15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
  551 U.S. 308, 322, 127 S. Ct. 2499 (2007)............................................................... 10

*Tri-City Elec. Co., Inc. v. People of New York*
  96 A.D.2d 146, 152, 468 N.Y.S.2d 283 (4th Dep't 1983)........................................ 15

*Utica Sheet Metal Corp.* v. *J.E. Schecter Corp.*
    47 Misc.2d 290, 292, 262 N.Y.S.2d 583 (N.Y. Sup. Ct. 1965) ................................. 12

**Statutes**

28 U.S.C. §1452 (2009) ............................................................................................. 9

**Other Authorities**

N.Y. Lien Law §§ 70-79a (2009) ............................................................................ 12

NY Lien Law § 70.1 (2009) ......................................................................... 2, 11, 16

NY Lien Law § 70.2 (2009) .............................................................................. 2, 15

**Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................................ 1, 10, 22

Fed. R. Civ. P. 12(d) .............................................................................................. 10

Federal Rules of Bankruptcy Procedure 7019 ....................................................... 1

Federal Rules of Bankruptcy Procedure 7012 ............................................... 1, 10

Defendant The Bank of New York Mellon ("BNY Mellon"), by its undersigned counsel, respectfully submits this Memorandum of Law, and the accompanying Declaration of Alex T. Chang, dated October 23, 2009 ("Chang Dec.") in support of its Motion for an order pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, as made applicable to this adversary proceeding by Rules 7012 and 7019 of the Federal Rules of Bankruptcy Procedure, dismissing the complaint, dated June 11, 2009 ("Complaint" or "Compl."), filed by plaintiff Structure-Tone Inc. ("Structure-Tone"), purportedly on behalf of itself and certain unnamed others (collectively, "Plaintiffs"), for failure to state a claim upon which relief may be granted, together with such other and further relief as the Court may deem appropriate.

## PRELIMINARY STATEMENT

The Complaint alleges that the proceeds of the sale of certain bonds issued by New York Liberty Development Corporation ("New York Liberty"), which funded a loan from New York Liberty to National Sports Attraction, LLC ("National Sports" or "Debtor"), constituted the corpus of a trust under the New York Lien Law ("Lien Law" or "Article 3-A"); that BNY Mellon was a trustee of that alleged trust, and Plaintiffs, as the beneficiaries of that alleged trust, were owed a duty by BNY Mellon; and that the assets of that alleged trust were improperly diverted to Plaintiffs' detriment. *See* Chang Dec., Ex. 1, Complaint, ¶¶ 20, 30, 39, 49-51. Each of these allegations is wrong as a matter of law.

First, BNY Mellon was merely the indenture trustee with respect to the bonds. As such, it served only in an administrative capacity, not as a fiduciary, and it acted solely for the benefit of the bondholders under the applicable indenture.

Second, under the Lien Law, a statutory trustee is expressly limited to an "owner...contractor...or...subcontractor."[1] BNY Mellon is none of these.

Third, the corpus of a statutory trust under the Lien Law is limited to funds "received" by an "owner...contractor...or...subcontractor."[2] Bond proceeds delivered directly to an indenture trustee, such as BNY Mellon, have not in any way been "received" by an owner or contractor and they are not converted into trust funds under the Lien Law. The statute is clear and case law does not support Plaintiffs' theory.

In light of the unequivocal terms of the governing documents, Plaintiffs' Complaint fails to state a cause of action and therefore must be dismissed as against BNY Mellon.

## FACTUAL BACKGROUND

BNY Mellon believes that none of the following facts are in dispute. All of the documents referenced herein are in the possession of the Plaintiffs and available to all of the parties which have appeared in this adversary proceeding.

## I. THE BASIC DOCUMENTS

On or about August 1, 2006, National Sports and New York Liberty[3] entered into a Loan Agreement (the "Loan Agreement") pursuant to which New York Liberty agreed to make a loan to National Sports to fund a private development project. *See* Chang Dec., Ex. 1, Compl.

---

[1]  NY Lien Law § 70.1 (2009).

[2]  NY Lien Law § 70.2 (2009).

[3]  New York Liberty is a quasi-governmental local development corporation that was established by the New York Job Development Authority for the purpose of, among other things, issuing bonds qualified as tax-exempt by the Job Creation and Worker Assistance Act of 2002, being Public Law No. 107-147 and other non-federally tax-exempt obligations. Under this grant of authority, New York Liberty is authorized to sell bonds in support of various public and private projects. *See* Chang Dec., Ex. 2, Indenture, p.1.

p. 7, ¶ 20. New York Liberty sold bonds in order to fund that project, known as the National

Sports Museum ("Sports Museum"), located at 26 Broadway, New York, New York. *Id.* As

more fully set forth in a Private Placement Memorandum Dated August 4, 2006 ("Private

Placement Memorandum"), $52,000,000 was raised by sale of Series 2006A Revenue Bonds,

and the remaining $5,000,000 was raised by sale of Series 2006B Revenue Bonds (collectively,

the "Bonds").[4] *See* Chang Dec., Ex. 3, Private Placement Memorandum, p. 1.  The Private

Placement Memorandum also states that approximately $46,000,000 of the bond proceeds were

to be deposited into a construction account, and allocated to pay for the labor, materials, and

equipment necessary to complete the Sports Museum. *See* Chang Dec., Ex. 1, Compl. p. 7, ¶ 20;

Chang Dec., Ex. 3, Private Placement Memorandum, p. 33.

      BNY Mellon is the Indenture Trustee with respect to the Bonds pursuant to an

Indenture, also dated as of August 1, 2006 ("Indenture"), between New York Liberty and BNY

Mellon. *See* Chang Dec., Ex. 2, Indenture.  Pursuant to the Indenture, the Indenture Trustee, as

assignee of New York Liberty's interests, holds a security interest in all assets of National

Sports. *See* Chang Dec., Ex. 2, Indenture, pp. 25-26, Section 5.01.

      In accordance with the Indenture and Loan Agreement, BNY Mellon deposited

proceeds from the sale of the Bonds into specific accounts, and held those funds for the benefit

of the owners of the Bonds (the "Bondholders"), to be disbursed only as provided for therein.

Significantly, the flow of funds was structured so that the bond proceeds were transferred first

from the Bondholders to New York Liberty, and then from New York Liberty to the Indenture

Trustee.  The Indenture Trustee held the bond proceeds solely for the benefit of the Bondholders

---

[4]    The only significant difference between the two separate issues is the taxability of interest payments.

and made distributions only to pay authorized costs. Proceeds were not received directly by National Sports as borrower. *See* Chang Dec., Ex. 2, Indenture, pp. 25-36.

It bears repeating: the total proceeds of $57,000,000 from the bond sale went from the Bondholders to New York Liberty to BNY Mellon as Indenture Trustee. Pursuant to Section 3.04 of the Indenture, and for the sake of administrative convenience, the Indenture Trustee held the proceeds from the sale of the Bonds in four separate accounts:

- the Construction Account of the Project Fund, which was sub-divided into the 2006A Construction Account ("2006A Construction Account") and the 2006B Construction Account ("2006B Construction Account");

- the Capitalized Interest Account of the Project Fund, which was sub-divided into the 2006A Capitalized Interest Account ("2006A Capitalized Interest Account") and the 2006B Capitalized Interest Account ("2006B Capitalized Interest Account");

- the Costs of Issuance Fund ("Costs of Issuance Account"); and

- the Debt Service Reserve Fund, which was sub-divided into the 2006A Debt Service Reserve Account ("2006A Debt Service Reserve Account") and the 2006B Debt Service Reserve Account ("2006B Debt Service Reserve Account").

*See* Chang Dec., Ex. 2, Indenture, pp. 21-22, Section 3.04.

As set forth in Section 3.04 of the Indenture, specific amounts were allocated to each of these accounts:

- approximately $46,000,000 was deposited into the 2006A Construction Account and 2006B Construction Account;

- approximately $4,000,000 was deposited into the 2006A Capitalized Interest Account and 2006B Capitalized Interest Account;

- approximately $3,900,000 was deposited into the Costs of Issuance Account; and

- approximately $7,500,000 was deposited into the 2006A Debt Service Reserve Account and the 2006B Debt Service Reserve Account.

*See* Chang Dec., Ex. 2, Indenture, pp. 21-22, Section 3.04; Chang Dec., Ex. 3, Private Placement Memorandum, p. 33.

As required by the governing documents, the Indenture Trustee held funds in the above-referenced accounts strictly for the benefit of the Bondholders. As detailed below, none of these funds were received first by National Sports as borrower.[5]

## II.   INTERACTIONS AMONG THE PARTIES

The closing for this series of transactions took place on or about August 17, 2006. National Sports subsequently documented and described to the Indenture Trustee various agreements with contractors, subcontractors, materialmen, suppliers, and others for the performance of work and the furnishing of materials and equipment for the construction of the physical plant and exhibits of the Sports Museum. *See* Chang Dec., Ex. 1, Compl. pp. 7-8, ¶ 24. Between August 2006 and September 2008, various amounts were disbursed from the Construction Account in accordance with the governing agreements in order to pay these costs. *See* Chang Dec., Ex. 5, Statements of Transactions for 2006A and 2006B Construction Accounts. Before disbursing any such funds, BNY Mellon received formal requisitions from National Sports, each of which was signed by Sameer Ahuja as the Authorized Borrower Representative for National Sports. *See* Chang Dec., Ex. 6, Requisition 11-A.[6] Mr. Ahuja certified that the requested amounts were for construction costs, and the accompanying back-up documentation attached to each requisition, including invoices, bills, and other correspondence, demonstrated

---

[5]   Limited funds were paid to National Sports as reimbursement of documented construction expenses it previously paid out. *See, infra*, pp. 6-7.

[6]   Requisition 11-A is typical in form of such requisitions, and is provided as an example only. Plaintiffs have advised BNY Mellon that they have copies of all such requisitions.

that the funds were to be used (or had been used) for appropriate costs and expenses. *See* Chang Dec., Ex. 6, Requisition 11-A.

In addition to amounts disbursed from the Construction Account pursuant to the requisitions, the Indenture Trustee made regular interest payments to the Bondholders from the Capitalized Interest Account. *See* Chang Dec., Ex. 7, Statements of Transactions for 2006A and 2006B Capitalized Interest Accounts.

Again, as contemplated by the relevant agreements, the bond proceeds were received directly by New York Liberty as lender and then delivered to BNY Mellon as Indenture Trustee, without ever passing through National Sports as borrower. *See* Chang Dec., Ex. 2, Indenture, pp. 25-36. Indeed, the funds at issue were never in possession of the borrower unless such funds were purposefully disbursed from BNY Mellon to National Sports. To the extent that any such requisition amounts were paid directly to National Sports, these funds represented reimbursements for proper construction costs, and were paid out upon the provision of appropriate back-up documentation. Such documentation included the certification of Mr. Ahuja and the construction monitor. *See* Chang Dec., Ex. 6, Requisition 11-A.

Requisition of the Borrower Number 11-A, dated December 17, 2007, ("Requisition 11-A"), for example, included requests for disbursements to Structure-Tone, National Sports, and five other vendors. *See* Chang Dec., Ex. 6, Requisition 11-A. Each such requisition was signed by Mr. Ahuja, and the accompanying schedule and back-up documentation identify vendors paid for costs incurred. As demonstrated by the accompanying back-up documentation for Requisition 11-A, the Indenture Trustee paid $600,345 to Structure-Tone for construction labor and materials. *Id.* Also under Requisition 11-A, National Sports was reimbursed by the Indenture Trustee in the amount of $164,742 for a payment made to

Verizon for the relocation of a direct feed and riser cables in the basement of the Sports Museum building. *Id.* At least thirty-three (33) such requisitions were issued by National Sports.

On or about August 17, 2006, National Sports entered into a Construction Management Agreement with Plaintiff Structure-Tone, under which Structure-Tone undertook to furnish labor, material, and equipment to the construction project for the agreed sum of $34,266,878.00. *See* Chang Dec., Ex. 1, Compl. p.8, ¶ 26; Chang Dec., Ex. 3, Private Placement Memorandum, p.17. In this action, Plaintiffs allege that while Structure-Tone performed all of the terms and conditions of the Construction Management Agreement, National Sports breached the contract by failing to pay Structure-Tone despite its full work performance. *See* Chang Dec., Ex. 1, Compl., p. 8, ¶¶ 27 – 28.

Of course, Structure-Tone is not the Debtor's only creditor. National Sports failed to make certain required payments under the Loan Agreement, and an Amended Notice of Default ("Amended Notice of Default") was sent to all relevant parties on or about September 18, 2008. *See* Chang Dec., Ex. 8, Amended Notice of Default.

The gravamen of Plaintiffs' Complaint is that its unpaid claim was and is superior to the claim of the Indenture Trustee vis-à-vis funds held under the Indenture on behalf of the Bondholders.

## III. BONDHOLDERS' FEBRUARY 2009 INSTRUCTION TO BNY MELLON DIRECTING DISBURSEMENT OF FUNDS

Following the default by National Sports, Bondholders holding 100% of the Bonds instructed the Indenture Trustee, pursuant to a Letter of Instruction dated February 12, 2009 (the "Instruction Letter"), to distribute to them all of the funds representing the remaining proceeds of the bonds and all other monies in its possession in excess of $500,000, pro rata. *See* Chang Dec., Ex. 9, Instruction Letter, p.1. In furtherance of its express duties under the

Indenture, BNY Mellon acted in accordance with the Bondholders' direction and disbursed the funds as instructed through the Depository Trust Company ("DTC"). *Id.*

In the Instruction Letter, the Bondholders instructed the Indenture Trustee to declare all installments of the loan payments for the remainder of the terms of the Loan Agreement to be immediately due and payable, and to accelerate the principal and all accrued interest on the bonds. *Id.* Pursuant to Section 7.03 of the Indenture, the Bondholders also directed that the funds to be distributed be applied first to payment of accrued interest and then to unpaid principal. *Id.*

The Indenture Trustee followed the Bondholders' instructions, accelerated the indebtedness, and disbursed:

- approximately $150,550 from the 2006A Construction Account;

- approximately $46,119 from the 2006B Construction Account;

- approximately $1,217,038 from the 2006A Capitalized Interest Account;

- approximately $119,903 from the 2006B Capitalized Interest Account;

- approximately $5,200,000 from the 2006A Debt Service Reserve Account; and

- approximately $2,255,000 from the 2006B Debt Service Reserve Account.

These February 2009 disbursements totaled approximately $8,540,209.[7] *See* Chang Dec., Ex. 10, Excel Spreadsheet; Ex. 5, Statements of Transactions for 2006A and 2006B Construction Accounts; Ex. 7, Statements of Transactions for 2006A and 2006B Capitalized Interest Accounts; Ex. 11, Statements of Transactions for 2006A and 2006B Debt Service Reserve Accounts; Ex. 12, Statement of Transactions for Cost of Issuance Account. *See also* Chang

---

[7] Subsequently, an additional amount of approximately $97,780 from a "Lease Reserve Account" was distributed to the Bondholders through DTC.

Dec., Ex. 13, Notice of Acceleration and Distribution of Funds, dated February 13, 2009 ("Notice of Acceleration").

Notably, after August 17, 2008, BNY Mellon made no transfers or disbursements other than the amounts distributed according to the Bondholders' Instruction Letter.

## IV.   PRESENT ACTION

On March 13, 2009, National Sports filed a voluntary chapter 7 petition in United States Bankruptcy Court in the Southern District of New York.  Plaintiffs brought this action soon thereafter, on June 11, 2009, alleging that all defendants, including BNY Mellon, are liable for the receipt and/or participation in the diversion of the funds alleged to be trust assets.[8]  *See* Chang Dec., Ex. 1, Compl. p.10, ¶ 39.  Plaintiffs seek recovery of a portion of such funds, in the amount of at least $7,000,000, from all named defendants. *See* Chang Dec., Ex. 1, Compl. p.11, ¶ 50.

## ARGUMENT

## I.   LEGAL STANDARD ON MOTION TO DISMISS

Plaintiffs' Complaint fails to state a cause of action upon which relief may be granted and must be dismissed.  While on a motion to dismiss the Court must accept all well-pleaded facts as true, *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996), the factual allegations set forth in a complaint must be plausible, and raise the right to relief above the speculative level. *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007); *In re Fabrikant & Sons, Inc.*, 394 B.R. 721, 730 (Bankr. S.D.N.Y. 2008).  "[L]abels and conclusions, and a formulaic recitation of the elements of a cause of action

---

[8]     The lawsuit was commenced in New York State Supreme Court, New York County, and was timely removed by BNY Mellon pursuant to 28 U.S.C. §1452.

will not do." *Twombly*, 127 S. Ct. at 1965; *In re Magnesium Corp. of America*, 399 B.R. 722,

741 (Bankr. S.D.N.Y. 2009*); see Paycom Billing Servs. v. Mastercard Int'l, Inc.*, 467 F.3d 283,

289 (2d Cir. 2006) ("[W]e do not 'permit conclusory statements to substitute for minimally

sufficient factual allegations.'") (citations omitted). Rather, the plaintiff must "amplify a claim

with some factual allegations in those contexts where such amplification is needed to render the

claim *plausible*." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis in original)

*rev'd by Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009); *In re Musicland Holding. Corp.*, 398 B.R. 761,

774-73 (Bankr. S.D.N.Y. 2008). Plaintiffs' Complaint fails that test.

      Here, the documents underlying the transactions attacked by Plaintiffs

demonstrate the absence of any legal basis underlying the Complaint. "Courts must consider the

complaint in its entirety, as well as other sources courts ordinarily examined when ruling on Rule

12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by

reference, and matters of which a court may take judicial notice."[9] *Tellabs, Inc. v. Makor Issues*

*& Rights, Ltd.,* 551 U.S. 308, 322, 127 S. Ct. 2499, 2509 (2007); *In re AlphaStar Ins. Group*

*Ltd.*, 383 B.R. 231, 256 (Bankr. S.D.N.Y. 2008). Further, "where a plaintiff's conclusory

---

[9] Pursuant to FRCP Rule 12(d), courts are given discretion to consider extrinsic materials offered in conjunction with a motion to dismiss under FRCP 12(b)(6). *See* Fed. R. Bankr. Pro. 7012 ("[FRCP]12(b)-(i)... apply in adversary proceedings."). Without converting the motion to a motion for summary judgment, a court may consider (i) matters of which judicial notice may be taken; (ii) documents attached to the complaint; (iii) undisputed documents alleged or referenced in the complaint; and (iv) documents of which plaintiff has notice and on which it relies in bringing its claim. *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47 (2d Cir. 1991); *In re Enron Corp.*, 328 B.R. 58, 65 (Bankr. S.D.N.Y. 2005); *In re Park South Securities, LLC,* 326 B.R. 505 (Bankr. S.D.N.Y. 2005); *In re Leslie Fay Companies, Inc.*, 166 B.R. 802 (Bankr. S.D.N.Y. 1994). However, should a court elect to consider matters outside the pleadings, then it must treat a Rule 12(b)(6) motion as one for summary judgment under Rule 56. *See also* Fed. R. Bankr. Pro 7012 ("[FRCP]12(b)-(i)... apply in adversary proceedings."); *Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 154-56 (2d Cir. 2006) (conversion is mandatory when matters outside the complaint are presented and not excluded by the court); *Festa v. Local 3 Int'l Bhd. of Elec. Workers*, 905 F.2d 35, 38 (2d Cir. 1990) (conversion mandatory pursuant to language in Rule 12(d)). BNY Mellon believes that this motion is properly styled as a motion to dismiss under FRCP 12(b)(6), however to the extent that this Court elects to consider documents outside the pleadings, the motion may be treated as a summary judgment motion and granted based on the undisputed facts presented herein.

allegations are clearly contradicted by documentary evidence incorporated into the pleadings by reference . . . the court is not required to accept them." *Labjo v. Best Buy Stores, L.P.,* 478 F. Supp. 2d 523, 528 (S.D.N.Y. 2007); *In re Fabrikant & Sons, Inc.*, 394 B.R. at 731.

Structure-Tone fails to specify any legally cognizable basis for imposing liability on BNY Mellon. It alleges only that BNY Mellon "received trust assets and/or participated and/or consented to the diversion of trust assets in violation of Article 3-A of the Lien Law of the State of New York." Compl., P. 10, ¶ 39. BNY Mellon has not violated Article 3-A of the New York Lien Law, however, for the simple reason that the role of the Indenture Trustee falls outside the definition of a statutory trustee under Article 3-A. None of the funds at issue ever became trust funds pursuant to Article 3-A. Accordingly, Structure-Tone is not entitled to relief against BNY Mellon under any of the causes of action asserted in the Complaint and this action should be dismissed.

## II.   BNY MELLON IS NOT LIABLE AS A STATUTORY TRUSTEE UNDER NEW YORK LIEN LAW ARTICLE 3-A

BNY Mellon cannot be found liable under Article 3-A because it is not a trustee as defined by the statute. Article 3-A of the New York Lien Law imposes a statutory trust on funds received by a statutory trustee, and defines this trustee as an "owner, contractor or sub-contractor," whose duties run to the benefit of those performing work in connection with a contract for the improvement of real property made during the performance of the contract. *ALB Contracting Co. v. York-Jersey Mortgage Co.*, 60 A.D.2d 989, 989, 401 N.Y.S.2d 934, 934 (4th Dep't 1978); *See* NY Lien Law § 70.1 (2009). Specifically, the beneficiaries under this statute include "sub-contractors, architects, engineers, surveyors, laborers and materialmen." *Id.*; *See also Givoh Assocs. & KZHB v. American Druggists Ins. Co.*, 562 F.Supp. 1346, 1350 (E.D.N.Y. 1983); *In re Elm Ridge Assocs.*, 234 F.3d 114, 124 (2d Cir. 2000).

New York courts have consistently rejected attempts to expand the language in Article 3-A. No one other than an "owner, contractor, or subcontractor" may be designated as a prospective trustee under Article 3-A. *ALB Contracting Co.*, 60 A.D.2d at 989 (citing *Utica Sheet Metal Corp.* v. *J.E. Schecter Corp.*, 47 Misc.2d 290, 292, 262 N.Y.S.2d 583, 587 (N.Y. Sup. Ct. 1965); *see also* N.Y. Lien Law §§ 70-79a (2009). Courts strictly limit the scope of those who may fall within this role because the duties imposed on a statutory trustee under Article 3-A are "extensive and burdensome," and subject a statutory trustee to "extensive potential liability." *ALB Contracting Co.*, 60 A.D.2d at 989. *See also Givoh Assocs.*, 562 F.Supp. at 1350 (citing *ALB Contracting Co.* , 60 A.D. at 989). In setting such limits, New York courts explicitly have excluded banks in which funds are deposited, stating that there is no "precedent or support" for treating such a bank as a statutory trustee. *Utica Sheet Metal Corp.*, 262 N.Y.S.2d at 587; *See also Interel Environmental Technologies, Inc., v. United Jersey Bank*, 894 F.Supp.623, 633 - 634 (E.D.N.Y. 1995).

BNY Mellon is the Indenture Trustee acting solely for the benefit of the Bondholders, as set forth in the Indenture. *See* Chang Dec., Ex. 2, Indenture, p. 43, Section 8.01. BNY Mellon clearly does not fall within the definition of statutory trustee as set forth in Article 3-A, as its minimal role in the transactions at issue is limited to the ministerial duties and obligations set forth in the Indenture. BNY Mellon is not an "owner, contractor or subcontractor" which received funds to be used in connection with the construction of the Sports Museum. Rather, under the governing documents, BNY Mellon's role was limited to disbursing funds from the 2006A and 2006B Construction Accounts pursuant to the requisitions, and to making interest payments from the 2006A and 2006B Capitalized Interest Accounts. BNY Mellon also fulfilled its obligation as Indenture Trustee by distributing funds in February 2009

pursuant to the Instruction Letter received from the Bondholders. *See* Chang Dec., Ex. 9, Instruction Letter; Chang Dec., Ex. 10, Excel Spreadsheet. At no point did BNY Mellon act as an "owner, contractor or sub-contractor" under Article 3-A. *ALB Contracting Co.,* 60 A.D.2d at 989.

## III. CLAIMS UNDER ARTICLE 3-A AGAINST A PARTY THAT IS NOT A STATUTORY TRUSTEE MUST BE DISMISSED

New York Courts consistently have dismissed claims brought under Article 3-A of the Lien Law against those who are not statutory trustees. The failure to fall within this definition precludes any finding of liability. *See In re Elm Ridge Assocs.*, 234 F.3d at 124 (dismissing claims brought against construction lender as Section 73 and Article 3-A of the Lien Law are "inapposite to the instant case" because defendant was a construction lender and not a "property owner, contractor, subcontractor or transferee" as is required to be a trustee under the statute); *Givoh Assocs.*, 562 F.Supp. at 1350 (applicable New York Lien Law did not support third-party claims brought against mortgagee as the court refused to expand the category of persons included as a statutory trustee under Article 3-A to encompass mortgagees); *Bos-Hatten, Inc. v. Holtec Int'l Corp.*, 186 A.D.2d 1031, 1031, 588 N.Y.S.2d 479, 479 (4th Dep't 1992) ("In the absence of express statutory authority imposing the duties of an article 3-A trustee on defendant, it was entitled to an order dismissing plaintiff's second cause of action"); *Caledonia Lumber & Coal Co. v. Chili Heights Apts.*, 70 A.D.2d 766, 766, 417 N.Y.S.2d 536, 537 (4th Dep't 1979) (reversing lower court decision and granting motion to dismiss on lien law claims brought against lender because "a lender is not a statutory trustee within Article 3-A of the Lien Law"); *ALB Contracting Co.*, 60 A.D.2d 989, 989, 401 N.Y.S.2d 934, 934 (4th Dep't 1978) (holding that mortgagee did not become a statutory trustee by withholding or re-obtaining funds due the owner-contractor under the New York Lien Law and dismissing claims accordingly).

Moreover, New York law expressly protects indenture trustees due to the important and unique role served by these entities. Specifically, the duties of BNY Mellon as Indenture Trustee are "strictly defined and limited" to the terms of the Indenture. *Elliott Assocs. v. J. Henry Schroder* Bank & *Trust Co.*, 838 F.2d 66, 71 (2d Cir. 1988). Unlike an ordinary trustee which has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee "is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement." *Id.* (quoting *Meckel v. Continental Resources Co.*, 758 F.2d 811, 816 (2d Cir. 1985) (internal quotations omitted). As BNY Mellon fulfilled the terms and obligations of the Indenture by distributing funds pursuant to the governing agreements and the instructions given by the Bondholders, no further obligations may be imposed upon it.

The vital and unique role of the indenture trustee in financing transactions has been recognized by both courts and governing bodies. As noted by the Second Circuit, "trust indentures are important mechanisms for servicing corporate debt and banks play an essential role in the process that brings corporate financings to the public market." *Meckel*, 758 F.2d at 815. Section 8.01(a) of the Indenture specifically states that BNY Mellon is obligated to "perform such duties and only such duties as are specifically set forth in this Indenture." *See* Chang Dec., Ex. 2, Indenture, p.43, Section 8.01(a). Accordingly, BNY Mellon cannot be held liable for its alleged failure to perform any obligations beyond the scope of its duties under the Indenture.

Structure-Tone does not allege that BNY Mellon violated its duties under the Indenture, nor do the allegations state that BNY Mellon failed to act as it was required to by such agreement. Rather, Structure-Tone alleges that BNY Mellon "participated and/or consented to

the diversion of trust assets in violation of Article-3A," which misconstrues the distinct roles of

indenture and statutory trustees. Chang Dec., Ex. 1, Compl. p.10, ¶ 39. Structure-Tone absurdly

contends that the Indenture Trustee was required to act in a manner *contrary* to its duties under

the Indenture. Because BNY Mellon is not a statutory trustee under Article 3-A, the allegations

set forth in the Complaint are clearly not legally viable and these claims should be dismissed in

their entirety.

## IV. BOND PROCEEDS HELD BY THE INDENTURE TRUSTEE NEVER BECAME TRUST ASSETS UNDER ARTICLE 3-A

It is well-settled under New York law that before funds for construction of realty

become trust assets under Article 3-A, "they must be paid – that is received – by the owner of the

property or the contractor." *Interel,* 894 F.Supp. at 633; *See also* NY Lien Law § 70.2 (2009)

(funds must be "received" by the owner, contractor or subcontractor). Until the funds are

received by the owner or contractor, "there is neither a res nor a trust." *Id. See also Tri-City*

*Elec. Co., Inc. v. People of New York*, 96 A.D.2d 146, 152, 468 N.Y.S.2d 283, 288 (4th Dep't

1983); *Palmer Construction Inc. v. Hines*, 154 Misc.2d 248, 251, 584 N.Y.S.2d 271, 273 (N.Y.

Sup. Ct. 1992). Indeed, a trust is created under Section 70 of the Lien Law only when funds

related to a construction project come "into the hands of an owner or contractor." *Seaboard*

*Surety Co. v. Mass. Bonding and Ins. Co.*, 17 A.D.2d 795, 795, 232 N.Y.S.2d 809, 810 (1st

Dep't 1962).

The underlying objective of Article 3-A of the Lien Law is to "prevent an owner

or general contractor from pocketing construction loan proceeds for his own benefit" when those

who have added value to the improvement are deprived of a source of payment. *Grosso v. Truax*

*& Hovey, Ltd.*, 9 B.R. 815, 825 (Bankr. N.D.N.Y. 1981). In accordance with this purpose, the

trust fund is "limited to the portion of the loan that is received by the owner or contractor," and

no other amounts can constitute a 3-A trust fund. *Id.*; *See also Caledonia*, 70 A.D.2d at 766 ("trust fund is portion of the loan received by owner or contractor"); *ALB Contracting Co.*, 60 A.D.2d at 989.

In addition, Section 70 provides that "any right of action for any such funds due or earned or to be due or earned," also is part of the trust asset. *Interel*, 894 F.Supp. at 634 (quoting NY Lien Law § 70.1 (2009)). The statute explicitly includes the right to future payment as a potential trust asset, stating that "any right to receive payment at a future time shall be deemed a right of action therefor and an asset of the trust even though it is contingent upon performance or some other event." *Id.* However, Article 3-A "does not enlarge the right or excuse any performance or condition upon which it depends," therefore any such future or contingent right is limited to what would otherwise qualify as an Article 3-A trust asset under the statute. *Id.*

Plaintiffs erroneously assert that BNY Mellon "received trust assets and/or participated and/or consented to the diversion of trust assets in violation of Article 3-A." Chang Dec., Ex. 1, Compl., p.10, ¶ 39. To the contrary, the funds received by BNY Mellon in its capacity as Indenture Trustee never qualified as trust fund assets under Article 3-A. BNY Mellon held such funds solely for the benefit of the Bondholders by depositing the appropriate amounts in the four accounts as set forth in Section 3.04 of the Indenture. Specifically, Indenture Section 3.04(a) requires that particular amounts of the bond proceeds be deposited into the accounts and sub-accounts that were established for the sake of administrative convenience. *See* Chang Dec., Ex. 2, Indenture, pp. 21-22, Section 3.04. The facts articulated above clearly demonstrate that various amounts were disbursed from the Construction Account in accordance with the relevant agreements in order to pay for the construction costs of the Sports Museum

between August 2006 and September 2008. *See* Chang Dec., Ex. 5, Statements of Transactions for 2006A and 2006B Construction Accounts. Before disbursing such funds, BNY Mellon received requisitions containing the relevant back-up documentation demonstrating that the funds were to be used for appropriate costs and expenses.

In addition to amounts disbursed from the Construction Accounts pursuant to the requisitions, BNY Mellon regularly disbursed timely interest payments from the Capitalized Interest Account during the August 2006 - September 2008 period. *See* Chang Dec., Ex. 7, Statements of Transactions for 2006A and 2006B Capitalized Interest Accounts.

As contemplated by the Loan Agreement and the Indenture, the bond proceeds were either received directly by New York Liberty as lender or by BNY Mellon as Indenture Trustee, without ever flowing through the hands of National Sports as borrower. At no time during the August 2006 – September 2008 period did BNY Mellon ever disburse funds being held for the benefit of the Bondholders directly to the borrower such that National Sports would have "received" the funds within the meaning of Article 3-A. Further, National Sports neither paid out any amounts from the operations of the Sports Museum nor otherwise returned funds to BNY Mellon. Accordingly, an Article 3-A trust was never created and BNY Mellon cannot be held liable for an alleged "diversion" of funds which never constituted a Lien Law trust corpus.

Following the default notice that was sent to all relevant parties in September 2008, the Bondholders instructed BNY Mellon by letter dated February 12, 2009 to distribute all of the funds in excess of $500,000, in accordance with Section 7.01 of the Indenture. *See* Chang Dec., Ex. 8, Amended Notice of Default; Chang Dec., Ex. 9, Instruction Letter. As detailed above at pp. 7-8, *infra*, BNY Mellon followed the Instruction Letter and the Indenture and, pursuant to Section 7.01 of the Indenture, disbursed to the relevant parties funds from the

accounts at issue. *See* Chang Dec., Ex. 10, Excel Spreadsheet. The funds at issue were never "received" by National Sports within the definition of Article 3-A, and therefore BNY Mellon cannot be held liable for any alleged diversion of assets because no statutory trust ever existed from which any amounts could have been diverted or otherwise misappropriated.

As the funds held by BNY Mellon as Indenture Trustee never became the subject of a trust under Article 3-A, Structure-Tone's allegations against BNY Mellon must be dismissed in their entirety. New York Courts have repeatedly dismissed claims under similar circumstances alleging diversion or other allegedly illegal acts pursuant to Article 3-A where the funds at issue were never received by the borrower and therefore did not constitute a trust fund under the statute. *See Grosso*, 9 B.R. at 825 (dismissing complaint because plaintiff failed to prove that the funds received by the trustee comprised a statutory trust under Article 3-A); *Avon Elec. Supplies, Inc. v. Christ Gatzonis Elec. Contractors, Inc.*, 235 A.D.2d 380, 380, 652 N.Y.S. 2d 72, 73 (2d Dep't 1997) (affirming summary judgment decision dismissing claim because the payments withheld by the school construction authority for goods sold and delivered pursuant to construction contract "do not constitute assets of a Lien Law Article 3-A trust"); *Bos-Hatten, Inc.*, 186 A.D.2d at 1031 (affirming partial summary judgment motion to dismiss trust claim under Lien Law because any funds received by defendant from Con Edison pursuant to the purchase order for heaters did not constitute trust funds because defendant is neither a "contractor" nor "subcontractor" under the law).

The *Interel* case is particularly on point. In *Interel*, a sub-contractor had brought claims pursuant to Article 3-A on behalf of itself and approximately twenty-five others to recover monies allegedly due for construction work. *Interel*, 994 F.Supp. at 623. Island Recycling Corp. ("Island Recycling") had been awarded a contract to operate a facility in the

City of Glen Cove, Long Island ("Glen Cove"). *Id.* at 626. Island Recycling entered into a

construction management agreement with Glen Cove pursuant to which Island Recycling agreed

to "operate, maintain and manage" the facility for a term of years, and to perform any and all

reconstruction necessary to conform to a consent order. *Id.* In order to finance the necessary

construction of the facility, Island Recycling borrowed funds from the Glen Cove Industrial

Development Agency ("Agency"), a New York public benefit agency which raised the necessary

funds by issuing special obligation revenue bonds. *Id.*

The proceeds raised from the bond sale in *Interel* were to be used to pay for the

construction costs at the facility. *Id.* Pursuant to a trust indenture between the Agency and

United Jersey Bank as indenture trustee ("IDA Bond Trustee"), a $12 million fund was

established for the purpose of paying the construction costs. *Id.* Under the relevant agreements,

all requests for reimbursement of work were to be authorized according to a specific approval

process, and only upon final approval would the sub-contractor at issue be paid from the monies

being held by the IDA Bond Trustee. *Id.* In addition, under the terms of the trust indenture, the

Agency assigned its rights to the rent payments from Island Recycling to the IDA Bond Trustee

for the benefit of the bondholders. *Id.* at 626-627.

Island Recycling entered into a contract with Interel Environmental Technologies,

Inc. ("Interel") under which Interel installed certain equipment at the facility in exchange for

anticipated payment. *Id.* at 627. Interel commenced work on the property, and submitted

applications for progress payments to Island Recycling pursuant to the approval process outlined

above. *Id.* Although the initial requests were approved and paid, disputes over work being done

at the facility ultimately led to the rejection of several payment applications. Interel

subsequently filed a notice of lien and commenced an Article 78 proceeding to compel Glen

Cove to approve and release the monies in the fund held by the IDA Bond Trustee. *Id.*

While the Article 78 case was pending, Interel brought a motion for a preliminary

injunction to enjoin the bondholders from withdrawing bond proceeds held by the IDA Bond

Trustee and designated to pay subcontractors for their construction costs. *Id.* As part of its

determination that the plaintiff was not likely to succeed on the merits, the court concluded that

the money sought by Interel did not qualify as a trust asset under Section 70 of the New York

Lien Law because it did not meet the statutory definition of a trust. *Id.* The court first

acknowledged that Island Recycling was a contractor as defined in the Lien Law, and the

proceeds of the bonds issued by the Agency were "to be used to finance a public improvement

project." *Id.* at 633. However, the court then emphasized that under "well-settled" New York

state law, funds for construction of realty must be "paid - that is received - by the owner of the

property or the contractor" before they may become trust assets under Article 3-A. *Id.* at 634.

Although the funds at issue in the *Interel* case were designated as being for the

purpose of paying construction costs for the project, the focus of the *Interel* court was that the

agency's bond proceeds were "put in a trust account *for the benefit of the bondholders*." *Id.*

(emphasis in original). That the trust was held for the bondholder's benefit was "amply

conveyed" by the language of the indenture agreement, and by the fact that the fund was secured

by a perfected lien on behalf of the bondholders. *Id.* Based on this analysis, the *Interel* Court

concluded the bond proceeds had not been "received" by Island Recycling in order to qualify as

a statutory trust under Article 3-A. *Id.* Further, the *Interel* Court determined that Island

Recycling did not have any future, contingent, or unmatured right to the bond proceeds as a trust

asset, as any such right to payment from the undisbursed amounts held in reserve would have

terminated once the bond redemption deadline expired. *Id.* at 635. Relying on the language in Section 70, which states that any right to a trust asset "does not enlarge the right or excuse any performance or condition upon which it depends," the *Interel* Court concluded that there is no way that Interel could file a lien on the fund as a statutory trust asset under Article 3-A of the Lien Law. *Id.*

Applying the analysis of the *Interel* Court to the instant action, Structure-Tone similarly does not have a right to any of the funds held by the Indenture Trustee because such funds never constituted a statutory trust under Article 3-A. The funds raised by New York Liberty also were to be used for the purpose of paying construction costs for the Sports Museum, and they were similarly put into a trust account "for the benefit of the bondholders." *Id.* at 634. BNY Mellon held these funds pursuant to the Indenture, and the funds were disbursed properly according to the terms of the relevant agreements to pay for construction costs. Just as Island Recycling never "owned or controlled" the proceeds in the *Interel* case, National Sports never "owned or controlled" the proceeds in this matter. *Id.* As the bond proceeds never were "received" by National Sports in order to qualify as a trust under Article 3-A, Structure-Tone cannot recover against BNY Mellon with respect to any of the funds at issue. Further, any future or contingent right asserted by Structure-Tone would have been terminated by the event of default, just as Interel's right was terminated by the expiration of the bond redemption deadline. Accordingly, Structure-Tone's Complaint should be dismissed in its entirety.

## CONCLUSION

For all of the foregoing reasons, BNY Mellon respectfully submits that its motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss for failure to state a claim, be granted in its entirety, together with such other and further relief as the Court may deem appropriate.

Dated: October 23, 2009
      New York, New York                    Respectfully submitted,

                                       REED SMITH LLP

                                         _s/ Mark D. Silverschotz__
                                         Eric A. Schaffer
                                         Mark D. Silverschotz
                                         Gail M. Eckstein
                                         599 Lexington Avenue
                                         New York, NY 10022
                                         Tel. (212) 521-5400
                                         Fax (212) 521-5450

                                         *Attorney for Defendant*
                                         *The Bank of New York Mellon*